**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

_____

| | | |
|---|---|---|
| **United States of America,** | ) | |
| | ) | No. **3:23-cr-08132-JJT-1** |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Flagstaff, Arizona |
| | ) | December 5, 2023 |
| **Donald Day Jr.,** | ) | 10:26 a.m. |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**BEFORE:  THE HONORABLE CAMILLE D. BIBLES, MAGISTRATE JUDGE**

**TRANSCRIPT OF PROCEEDINGS**

**ARRAIGNMENT/DETENTION HEARING**

**APPEARANCES:**

For the Plaintiff:
   **Dondi J. Osborne, Esq.**
   U.S. Attorney's Office
   123 N. San Francisco St., Suite 410
   Flagstaff, AZ 86001

For the Defendant:
   **Luke S. Mulligan, Esq.**
   Federal Public Defender's Office
   123 N. San Francisco St., Suite 204
   Flagstaff, AZ 86001

Transcriptionist:
Jennifer A. Pancratz
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 42
Phoenix, Arizona 85003-2151
(602) 322-7198

Proceedings Recorded by Electronic Sound Recording
Transcript Produced by Transcriptionist

<u>**P R O C E E D I N G S**</u>

1

2          (Proceedings commenced at 10:26 a.m.)

3          THE COURTROOM CLERK:  This is Case No. CR-2023-8132,

4  United States of America versus Donald Day Jr.  Defendant is

5  present and in custody.

6          This is the time set for an arraignment and a

7  detention hearing.  Counsel?

8          MS. OSBORNE:  Good morning, Your Honor.  Dondi Osborne

9  for the United States.

10          THE COURT:  Good morning, Ms. Osborne.  Do you have a

11  case agent at counsel table?

12          MS. OSBORNE:  I'm sorry, yes.  Agent -- Special Agent

13  Sietta [phonetic] from FBI is present with me at counsel's

14  table.

15          THE COURT:  All right.  Thank you and good morning.

16          MR. MULLIGAN:  Good morning, Your Honor.  Luke

17  Mulligan for Donald Day.

18          THE COURT:  And good morning, Mr. Mulligan, and good

19  morning, Mr. Day.

20          Mr. Day, this is the time set for two hearings in your

21  case.

22          Mr. Mulligan, have you had -- first I'm going to ask,

23  have you had an opportunity to review the pretrial services

24  report?

25          THE DEFENDANT:  Yes, Your Honor.

1          MR. MULLIGAN:  Yes, Your Honor, I did with Mr. Day.

2          THE COURT:  All right.  And Mr. Mulligan, based on one

3    bit of information there, I have concerns as to whether Mr. Day

4    can hear me properly.  Do you believe it would be helpful to

5    have headphones?

6          MR. MULLIGAN:  Do you need headphones to hear better?

7          THE DEFENDANT:  She talks very clear.  I can hear her.

8          MR. MULLIGAN:  I think we're fine, Your Honor.

9          THE COURT:  All right, thank you.  I just wanted to

10   inquire and make sure.

11          So, Mr. Day, this is the time set for two hearings in

12   your case.  We're going to start off with a formal arraignment

13   on the indictment first.

14          Mr. Mulligan, did you have an opportunity to review

15   the indictment with Mr. Day?

16          MR. MULLIGAN:  Your Honor, I did.  I reviewed the

17   indictment with Mr. Day.  His name is spelled correctly.  We

18   would waive a formal reading and enter a plea of not guilty.

19          THE COURT:  All right.  And I will enter pleas of not

20   guilty on the defendant's behalf to the two counts of the

21   indictment.

22          The motion deadline in this case is set for Tuesday,

23   December 26th of 2023, and a jury trial is scheduled for

24   Tuesday, February 6th of 2024, at 9:00 a.m. before District

25   Judge Tuchi in Phoenix Courtroom 505.

1          And I realize I did not go back to Ms. Osborne.

2     Ms. Osborne, as I reviewed the motion sealing this case, I

3     wanted to be sensitive to the United States' concerns.  Is the

4     United States moving to unseal the case based on the arrest of

5     the defendant?

6          MS. OSBORNE:  We are, Your Honor.

7          THE COURT:  All right.  And I will unseal the case at

8     this time based on compliance with the terms of really the

9     motion sealing it.

10          Now, the next hearing that we're going to take up,

11     Mr. Day, is the detention hearing.  And we discussed this a

12     little bit yesterday in terms of what I'm looking at, but in

13     essence, the two issues that I'm looking at are whether you

14     pose a risk of nonappearance at future proceedings, whether

15     you're a flight risk; and/or, two, whether you pose a danger to

16     the community or to any specific individuals in the community.

17          My decision today is really set out or is defined by

18     several legal principles defined by Congress in a statute, and

19     those -- that statute has been interpreted by the various

20     courts, and specifically the ones that I am paying close

21     attention to are those out of the Ninth Circuit.  There are a

22     number of factors that I'm guided to look at in making my

23     decision regarding detention or release.

24          Now, basically the way this works is if the United

25     States wants you held in custody, they have the burden of

```
1   establishing that you're a flight risk and/or a danger.  Now,
2   because they have that legal burden, they're allowed to begin
3   with any argument or proffer of facts.  Then Mr. Mulligan is
4   able to proceed with any argument or proffer of facts on your
5   behalf; and then if the United States, because they have that
6   burden, if they have any rebuttal information they'd like to
7   present, they're allowed a brief rebuttal.  And that's
8   basically how --
9             THE DEFENDANT:  Help me.
10            THE COURT:  -- the hearing goes.
11            So with that I'll turn --
12            THE DEFENDANT:  Please.
13            THE COURT:  -- to the United States.  Ms. Osborne?
14            MS. OSBORNE:  Your Honor --
15            THE DEFENDANT:  Help me.
16            MS. OSBORNE:  -- the government at this time is going
17  to request a continuance of the detention hearing this morning.
18  The pretrial services report came in this morning after I came
19  to court.  I've been in court all morning and have not had an
20  opportunity to review the pretrial services report.
21            I would note the Court set this fairly quickly --
22            THE COURT:  I did.
23            MS. OSBORNE:  -- yesterday, from first appearance
24  yesterday to today, and the statute does provide the government
25  three days when they request a continuance.
```

1          So our request here, in light of the pretrial services

2 report just coming in, as well --

3          THE DEFENDANT:  Please.  Please help me.

4          MS. OSBORNE:  -- a fairly large amount of information

5 to review in this case, is that the Court reset this matter for

6 a detention hearing on Thursday.

7          THE COURT:  All right.  Thank you.

8          THE DEFENDANT:  I don't care about all that.

9          THE COURT:  And I will note, obviously I set this

10 quickly.  I did let the parties know I -- that my plan was to

11 do that, and I knew that that would be pushing the pretrial --

12 basically the report that they're compiling on a very short

13 deadline, given all things to consider.

14          So, Mr. Mulligan, the United States, I believe --

15          THE DEFENDANT:  Help me.

16          THE COURT:  -- is entitled at this juncture to the

17 full three days from the initial appearance.  However, I do

18 want to be sensitive to Mr. Day's position.

19          MR. MULLIGAN:  Your Honor, as the pretrial services

20 report reflects, Mr. Day is very, very ill.  So he would like

21 to proceed with the detention hearing today.

22          THE COURT:  All right.  Ms. Osborne, if I was to --

23 and I'm frankly still weighing the concerns here.  Mr. Day

24 obviously wants to proceed quickly with the detention hearing,

25 and I'm sensitive to that, but I also believe the United States

1    is entitled to have sufficient time to prepare for that.

2            Would it assist the United States if I was to set this

3    a little later today?

4            And I need to put on the record that the Court is

5    unavailable tomorrow.  I have hearings in a remote part of the

6    state tomorrow, so the next available time would be Thursday

7    morning.

8            Ms. Osborne, given those concerns --

9            THE DEFENDANT:  You're not going to help me?

10           THE COURT:  -- what's the United States' perspective?

11           THE DEFENDANT:  I don't understand.

12           MS. OSBORNE:  Your Honor, we could be ready this

13   afternoon if you were to reset this matter into the afternoon.

14           And I would also mention defense has some materials

15   they want to tender to the Court that I haven't seen, so those

16   are additional matters I apparently need to review, but we'd do

17   our best to be ready this afternoon.

18           THE COURT:  All right.  And I believe we have a

19   conflict hearing this afternoon?

20           THE COURTROOM CLERK:  We do at 2:00 o'clock, Your

21   Honor.  It should take --

22           THE COURT:  Mr. Mulligan?

23           THE COURTROOM CLERK:  -- about five minutes?  It's

24   your case, Mr. Reed.

25           It will only take five minutes.

1              THE COURT:  All right.  Mr. Mulligan?

2              MR. MULLIGAN:  That's fine, Your Honor.

3              THE COURT:  All right.  And obviously, if there are

4    other materials that are going to be tendered at this

5    afternoon's hearing, it is this Court's practice for those

6    materials to be exchanged.

7              And I recognize I set this on a very short time

8    schedule --

9              MR. MULLIGAN:  Your Honor, I did provide them to the

10   government this morning about 8:30 or 9:00 o'clock.

11             MS. OSBORNE:  I'm sorry, I haven't --

12             THE COURT:  I believe Ms. Osborne --

13             MR. MULLIGAN:  I understand Ms. Osborne hasn't had a

14   chance to review them, but I did provide them.

15             THE COURT:  I can indicate that having been in court

16   earlier this morning, Ms. Osborne has been in court

17   continuously, and so I suspect she's not had time.

18             Ms. Osborne, again, I do want to make sure, if we were

19   to set this at 2:30 this afternoon, will that work for the

20   United States' purposes?

21             MS. OSBORNE:  It will, Your Honor.

22             THE COURT:  All right.  So why don't we go ahead.

23             What -- Mr. Day, you will be remanded to the marshals,

24   but we'll have you back here in court at 2:30 this afternoon

25   for the detention hearing in this case.

1          THE DEFENDANT:  Thank you, ma'am.

2          (Recess taken, 10:33 a.m. to 2:34 p.m.)

3          THE COURT:  Good afternoon.  Please be seated.

4          THE COURTROOM CLERK:  This is Case No. -- we are back

5    on the record with United States of America versus Donald Day

6    Jr.

7          Defendant is present.  All parties are present.  This

8    is the detention hearing.

9          THE COURT:  All right.  Good afternoon.  We are back

10   on the record for the detention hearing.

11         Ms. Osborne, I will check with you.  Obviously we set

12   this a little later in the day to allow you sufficient time to

13   be prepared.  Do you -- have you been able to take care of the

14   preparation that you were requesting?

15         MS. OSBORNE:  Yes, Your Honor.  Thank you.

16         THE COURT:  All right.  Very good.

17         And Mr. Mulligan, are there any last-minute issues

18   before we begin?

19         MR. MULLIGAN:  Your Honor, I have two character

20   letters I'd like to submit to the Court.  I have provided a

21   copy to Ms. Osborne.  I don't know if she objects or not.

22         THE COURT:  All right.  Please go ahead and provide

23   those.

24         THE COURTROOM CLERK:  Thank you.

25         THE COURT:  All right.  So basically when we broke, I

1    had explained how the statute works, how the issue of

2    detention, and basically that there are factors that I look at

3    work.

4            So I will turn first, because they have the burden, to

5    the United States for their argument and proffer of facts.

6    Ms. Osborne?

7            MS. OSBORNE:  Thank you, Your Honor.

8            Your Honor, here the defendant has been charged by

9    indictment.  The grand jury has found probable cause regarding

10   two counts of interstate threats, one to law enforcement

11   generally, as well one relating to the director general of the

12   World Health Organization.

13           And as to Count 1, on December 12th, 2022, the threats

14   toward law enforcement surround an incident that occurred in

15   Queensland, Australia.  On that date, December 12th, 2022, four

16   Queensland police officers went to the residence of a home that

17   was owned by Gareth and Stacey Train.  They are referenced in

18   the indictment as Individual 1 and 2.

19           Also at that residence was Nathaniel Train, or

20   Nathaniel Train was the brother of Gareth Train and associated

21   with the residence in any instance.  But the Queensland police

22   officers went to the residence looking for Nathaniel Train.

23   They had received a report from Nathaniel Train's wife several

24   months previous that he had been missing, and so they were

25   trying to connect with the residence to investigate that

1    allegation.

2          When the Queensland police officers walked toward the

3    Trains' residence, the Trains opened fire, killing two police

4    officers, wounding a third.  There was a police officer that --

5    the police officer that was wounded, not killed, was able to

6    make escape to a vehicle.

7          There was a fourth police officer that was wounded and

8    made escape to an area near the residence that is referred to

9    as "the bush."  And the Trains at that point in time, realizing

10   there had been a law enforcement officer that escaped,

11   unleashed their dogs to find that individual but also set the

12   bush afire hoping to flush that individual out.

13         That individual ultimately survived, was rescued

14   because law enforcement was notified of the incident.  A

15   neighbor heard shots fired, came over to investigate, and the

16   neighbor too was killed by the Trains.

17         On December 12th, after the officers were shot, the

18   Trains filmed themselves on YouTube.  And they posted a video

19   entitled "Don't Be Afraid" on their YouTube channel.  The video

20   lasted 41 seconds, and in that the Trains filmed themselves in

21   a dark setting and stated essentially:  They came to kill us,

22   and we killed them.  If you don't defend yourself against these

23   devils and demons, you're a coward.

24         They go on to say:  We'll see you when we get home.

25   We'll see you at home, Don.  Love you.

1        And the "Don" that the Trains were referring to was

2   the defendant, Donald Day Jr.

3        Evidence -- a significant amount of evidence in this

4   case includes evidence from social media and Gmail accounts, so

5   search warrants were executed on the Gmail account, as well

6   YouTube account of the Trains and the defendant, Donald Day.

7        And many comments and conversations were uncovered in

8   the execution of those search warrants.  But it was apparent

9   that Donald Day Jr. had been communicating with the Trains and

10  posting comments about the Trains and what they were engaged

11  in.

12       Mr. Day, the defendant here, posted a comment to this

13  video that was uploaded by the Trains and stated:  Truly, from

14  my core, I so wish that I could be with you to do what I do

15  best.  I tell you, family, that those bastards will regret that

16  they ever fucked with us.

17       Although I cannot be there under my own power and

18  will, the comfort and assurance that I can offer is that our

19  enemies will become afraid of us.  We are with you.  We too

20  will never, ever bow to the scum which plagues us.

21       Please do what you must do with determination in your

22  hand and fury in your bellies.  Tell me how I can help.

23  Anything that is within my range to do for you, I will not

24  hesitate.

25       We love you and we care for you.  Don and Annie.

1          The reference to Don and Annie is the defendant

2     signing off his own name, but also, the reference to Annie is

3     his wife, who's also known as Sabrina Spires.  So the defendant

4     clearly was supporting what the Trains had done.

5          On December 16th, about four days after the Queensland

6     police officers were killed, Mr. Day posted a video titled

7     "Daniel and Jane" to his YouTube channel using the name

8     Geronimo Bones.

9          There was a post-arrest, post-Miranda statement,

10    several statements by the defendant, Mr. Day.  And importantly,

11    one of those statements was he indicated he was the author of

12    Geronimo Bones, the YouTube social platform.  As well, he

13    indicated he was the identity and author of another social

14    platform called BitChute.  That's a social platform in

15    Australia.  His handle or go-by in that instance was "We're All

16    Dead As Fuck" was the title.  He indicated that he was the

17    author identified with that social media account.

18         In any instance, this posting four days after the

19    killing of the Queensland police officers said:  It breaks my

20    fucking heart that there's nothing I can do to help them.

21         It said:  My brave brother and sister, a son and

22    daughter of the Most High, have done exactly what they were

23    supposed to do, and that is to kill these fucking devils.

24         And in a number of the defendant's postings, he refers

25    to law enforcement or police officers as devils and demons.

1          He stated:  Well, like my brother Daniel, like my

2     sister Jane -- and those are references -- those are the middle

3     names of Gareth and Stacey Train.  So references to Daniel and

4     Jane are Gareth and Stacey Train, the Trains.

5          He says:  Well, like my brother Daniel, like my sister

6     Jane, it's no different for us.  The devils come for us, they

7     fucking die.  It's just that simple.  We're free people.  We're

8     owned by no one.

9          Day ended the video saying:  Daniel, Jane, if there's

10    any way possible that you're receiving this communication, I'm

11    sorry that I'm not there to fight with you.  There's no way for

12    me to be there.  If you're already home, our heavenly home,

13    hold a place for us because we'll be joining you soon enough --

14    making reference to if the Trains were killed, he would soon

15    join them, in apparent anticipation of being engaged in a

16    similar fight that the Trains were engaged in and possibly

17    being killed himself.

18         As also indicated on December 16th, the defendant

19    uploaded another video titled "Brother Sister Martyr" to his

20    YouTube channel, again, coined Geronimo's Bones.  And in that

21    communication, the defendant stated:  The Trains did what they

22    had to do because they would not submit to a monster, to an

23    unlawful entity, to a demonic entity.  Daniel and Jane did

24    exactly what their Heavenly Father would have done in the same

25    situation.

1          This is me speaking into the ether to bear witness

2     before my Heavenly Father, with the witness of my wife that I

3     am speaking the truth to this thing.  And just so you know,

4     that's the only language that evil ever respects, responds to,

5     or understands, and that's the language of virtual violence.

6          The defendant obviously -- well, perhaps not quite so

7     obviously by the communications yet, but the Court can tell

8     thus far there's an element of sovereignty in those statements

9     that the defendant makes.  And I want to read some additional

10     statements that demonstrate that a bit more.

11          But this Court, I'm imagining, has encountered

12     sovereign citizens before.  In the most general of terms,

13     they're a group of individuals who don't believe that the

14     federal government or many aspects of government have any

15     authority over them whatsoever, and this is Mr. Day's belief as

16     well.

17          The defendant has some criminal history, and that's

18     evinced in the pretrial services report.  I mentioned to the

19     Court yesterday, the defendant had a 1987 conviction for

20     larceny.  It was a felony.  He went to prison for that for two

21     to three years, and that conviction made him a prohibited

22     possessor.  It is anticipated a superseding indictment will be

23     coming and charging the defendant with prohibited use of or

24     possession of a firearm.

25          In the defendant's post-Miranda statements, one of the

things that he indicated was that he had been housed in prison
for a number of years as a result of killing his stepfather.
He stated that he walked in on his stepfather raping his sister
and killed him.

I didn't see that in the context of the pretrial
services report criminal history.  However, the defendant did
say that happened when he was a juvenile.  It's possible that
that is in records that haven't been accessed or perhaps are
not accessible.

I don't know if that's true or not, but it does
possibly shed light on some of the comments the defendant
makes.  The defendant has problems with authority in general,
also feels that government is corrupt and involved and
complicit in child sex trafficking rings.

And so I wanted to mention the defendant's statement
with respect to that previous experience he says he had and
that apparent prison sentence if that's correct.

There are a number of statements the defendant made
online that evinced his possession of -- his long-standing
possession of firearms.  And some of those are as follows:

On July 16, 2022 -- this evinces not only information
regarding firearms but the defendant's ideology in general
regarding his sovereignty.

July 16, 2022, Mr. Day made a comment to a YouTube
video posted by the channel Kansas Prepper.  And it states, in

quote:  In one of my last videos, I put forth the call for all

whom were willing to fight and kill the bad guys to join me at

Wounded Knee as our initial rallying point, armed to the teeth,

yet not a single one of you patriots answered.  In fact, many

of my videos were premised upon a call to action, and not once

were they favorably responded to.

So I am not one of the pussified patriots who refuse

to rally, fight, and die, if necessary.  My wife has a lunch

packed for me, my gear is within arm's reach of me, and my

rifle is oiled.  I'm ready to head out the door in less than

five minutes 24/7, 365, so what's it gonna be?

On another date, Day made the following comment to a

YouTube video posted by the channel The Common Sense Show.  He

states:  If you and yours would just demand that Americans

worth their salt to rally, armed to the teeth, eager and

willing to begin killing the monsters that are killing us all,

we might get the traction we need to defeat our wicked enemies.

The defendant states:  Far too much time wasted

fussing over unlawful actions of oath breakers, order

followers, and "yes" men.  When the law fails, it's up to you

to become the law, for you then become a living writ of habeas

corpus armed with applicable points, authorities, and a rifle

when necessary.

On February 28th, the defendant commented to a YouTube

video titled "Number 303 J'Acuse, J'Acuse, J'Acuse Complicit

1  Public Servants," and he stated:  Those who exist outside the

2  uniform drones of commerce have never participated in any fight

3  for freedom or justice.  I have an indomitable will, a noose

4  formed from barbed wire, and a shotgun, but I have not a single

5  American man to help me pull weeds.  We are on our own.

6        On May 5th, the defendant made the following comment

7  to a YouTube video titled "God is the Rainmaker."  He states:

8  Establishing the home you live in and the dirt it resides upon

9  as a holy ground takes effort borne of faith, diligence, and

10  intrepid disposition 24/7.

11        I know this to be true because I assert that authority

12  which our Father provides.  It's not easy, yet it's never

13  without its reward and the satisfaction that comes with it.

14  When I pray for endurance and victory over evil, I do so with a

15  shotgun cradled in my arms.

16        On July 25th, the defendant posted another comment to

17  YouTube in response to a video titled "The Topic at Hand," and

18  he states:  The patriot way is to arm up, mount up as a body of

19  "That's enough of your shit," and provoke the tyrants to come

20  to you.  Then it's killing time.  You die, they die.  Burn them

21  out, they burn you out.  A thousand different approaches,

22  strategies, and moves can be made, yet a real patriot is either

23  dead, in prison, or so disgusted with the two-dimensional

24  patriot types that they just say, "Fuck 'em.  They're on their

25  own."

1          So I say let those bean-stacking, cartridge

2   box-buying, tampon-inserting, lukewarm, virtue-signaling,

3   closet patriots fill the female camps, eat shit and die.  These

4   days I just watch the stupid through the keyhole till it's time

5   to center my rifle barrel through it.  Good luck to you anyhow.

6          Day made the following comment on a video taken down

7   by YouTube, which states:  Aaron, in order to maintain my ammo

8   cache, I work outside of the system.  I don't have a bank

9   account, credit card, birth certificate, Social Security card,

10  driver's license, or any of the unlawful and unconstitutional

11  trappings of the current American slave class.

12          I don't work for the system, I don't support the

13  system, and I most certainly don't back down from the system.

14  I find the way -- a way through the system or around it.  The

15  system and those who enforce the system are all criminals.

16          Finally, the defendant makes a number of comments,

17  Your Honor, inciting others toward violence, also comments

18  demonstrating his ideology of sovereignty.  And some of those

19  are as follows:

20          During a -- let me back up.

21          He expresses in these comments a lot of frustration

22  about failed attempts to incite people to violence, and

23  particularly, incite violence against law enforcement officers.

24          On June 5th, the defendant commented on a video

25  uploaded through the YouTube channel Empire Files, stating:  I

have diligently attempted to rally whomever I could from all

walks of life to make war with the demons that wear the flesh

of men.  Yet I've had absolutely no success.  It appears that

apart from a very few courageous souls, the spirits of the

oppressed are little more than sputtering candles wavering in

the winds of doubt, fear, and despair ever among our own kind,

I'm sad to report.

On July 10th, the defendant commented on a YouTube

channel, RPM Tre Vietnam, stating as follows:  What you've just

broken down to me is precisely the message I've been delivering

for eight years.  I've failed to rouse a single wannabe patriot

to get with the proper offensive, which fucked my mind up.

Considering the vast scope of open-ended criminal adventures

going down by the scum in DC to the killer cops running amok on

the street.

I mean, nothing moves the sorry motherfuckers we have

both attempted to call out, yet no matter how many folks are

unjustly and brutally subjugated to cruel and unusual

treatment, the lanes we try to encourage and motivate simply

have no heart, no balls, no purpose.  They're useless pieces of

shit.

On July 16th, the defendant made the following comment

to a YouTube video posted by the channel Kansas Prepper:  I put

forth the call for all who are willing to fight and kill the

bad guys to join me, armed to the teeth.

1        Finally, Mr. Day made the following comment to a

2   YouTube video posted by the channel The Common Sense Show, and

3   he stated:  If you and yours would just demand that Americans

4   worth their salt to rally, armed to the teeth, eager and

5   willing to begin killing the monsters that are killing us all,

6   we might get the traction we need to defeat our wicked enemies.

7        Mr. Day was arrested on December 1st.  A search

8   warrant was executed on his property.  He was also interviewed,

9   Mirandized, and waived Miranda and made statements.  And some

10  of his statements on December 1st to law enforcement were as

11  follows.

12       When discussing whether Mr. Day would record a video

13  urging his wife to come out peacefully -- Mr. Day was arrested

14  off of his property for safety purposes, and law enforcement

15  spoke with him, urging him to record a video to have Sabrina

16  Spires come out peacefully.

17       And during the conversation with law enforcement

18  regarding that, the defendant stated to agents:  If anything

19  happens to my wife, and if I ever get out of these cuffs, I'll

20  come for every fucking one of you.

21       Agents also discussed with the defendant the Trains'

22  death in Australia, and the defendant told law enforcement, I

23  wish I had been there to kill those fuckers with them so that

24  they weren't alone.

25       Law enforcement discussed with Mr. Day what would have

UNITED STATES DISTRICT COURT

1   happened had they come to his property with a SWAT team rather
2   than arresting him off of his property.
3          And he essentially stated that they would have been
4   mopping him up, referring to a shoot-out that would have
5   occurred.  He would have attempted to kill them.  They would
6   have ultimately killed him, and they would have been mopping
7   him up.
8          Day discussed with law enforcement other governmental
9   entities.  He seemed to be fixated on certain governmental
10  entities involved in child trafficking rings.  He referred to
11  Bill Gates and Hillary Clinton as scumbags and people that
12  would not walk out of the room alive if he were in it.
13         When officers executed the search warrant at Mr. Day's
14  property -- he and his wife own 90 acres, three separate
15  parcels.  It's a remote property a little ways out of Heber
16  City -- they found a number of things.
17         The property itself was set up -- and by the way,
18  Mr. Day made reference to this property being planned
19  essentially for his last stand, and essentially any law
20  enforcement that would come, there would be a stand.
21         And the property was situated for that stand.  He had
22  a Conex box, which is a shipping container, situated on the
23  property.  On top of the Conex box there were sandbags stacked
24  around the perimeter and top of the box, which essentially
25  provided as a shooting perch, provided as a means of resting

1   one's weapon to shoot and also a means of protecting those that

2   would shoot back at him.

3       There were several dugouts on the property, and by

4   "dugouts," I mean indentations in the ground that had -- where

5   the dirt had been dug out.  And in two of those instances,

6   there were camper shells from the back of trucks that were

7   placed over the dugouts.  Those appeared to have also been

8   ready as serving as essentially a shooting post, a protected

9   area where he could shoot out from the area.

10      Additional items found on the property included nine

11  firearms, one of the firearms was a sawed-off shotgun, and

12  several thousands of rounds of ammunition.  The defendant had

13  body armor and gas masks in his possession on the property as

14  well.

15      The investigation reveals that the defendant has

16  essentially, in his mind, created a world where there's evil

17  all around and he is the savior against that evil.  Many of the

18  evil entities in his mind are governmental authority and

19  particularly police officers.

20      When Sabrina Spires was interviewed, they -- law

21  enforcement asked her as well, what do you think would have

22  happened if the SWAT team had responded to arrest Mr. Day at

23  the property?

24      And she said, if that -- if the SWAT team had

25  responded, I would essentially be in heaven now with Mr. Day,

1    as well the Trains, essentially referencing that she would have

2    been involved in that fight, Mr. Day would have been involved

3    in a fight against law enforcement should they come to his

4    property.

5            Your Honor, our position is that the defendant is an

6    extreme danger to the community, and that's not just evinced by

7    the offenses the defendant is charged with.  I spent some time

8    going over the comments that he's made over time to demonstrate

9    that outside the offenses, he has a mindset which is extremely

10   dangerous.  He is geared toward eliminating the evil that he

11   sees to be as law enforcement and other governmental entities,

12   such as the person in Count 2, which is the director of the

13   World Health Organization.

14           The defendant has a belief that the government was

15   complicit in unleashing viruses and vaccinations which were

16   designed to harm the populace.  So in light of the defendant's

17   mindset, in light of the nature of the offenses, we believe

18   he's an extreme danger.

19           He's also a flight risk.  He does not recognize this

20   Court as having authority over him.  He will not submit to this

21   Court's orders, from the government's perspective.  And

22   certainly, if the defendant is permitted to be released and

23   does not submit to court orders to show up or otherwise and a

24   warrant is issued, there is no doubt that law enforcement would

25   be in extreme danger if they had to try to arrest the

1  defendant.

2         So our request is that the defendant be detained as a

3  danger as well as a risk of flight and that -- Your Honor, I

4  note that pretrial services indicates that Sabrina Spires is a

5  suitable third party.  I think the Court can tell from some of

6  the proffer, she is essentially complicit in this ideology so

7  she would not be a suitable third-party custodian.

8         Thank you.

9         THE COURT:  Thank you, Ms. Osborne.

10        Mr. Mulligan?

11        MR. MULLIGAN:  Thank you, Your Honor.

12        Your Honor, first, I will state the obvious.  My

13  client takes issue with many of the allegations made by the

14  government.  I can't cross-examine a proffer.

15        The indictment notwithstanding, obviously a grand jury

16  was presented information that caused them to find probable

17  cause, but from what Ms. Osborne just said, none of those

18  things she said constitutes a threat, Your Honor.

19        We have the right to free speech in this country.  And

20  for something to rise to being criminalized speech, it has to

21  be a true threat.  It can't be conditional.  There must be an

22  identified target.  Internet hyperbole, internet venting, does

23  not qualify as that, Your Honor.

24        The government's case is exceedingly weak.  The

25  government just had 20 minutes talking about all this -- these

1    terrible things he's done.  Not one of those things is illegal,

2    Your Honor.

3          Their conjecture that he's a -- has been -- is a

4    prohibited possessor, was in possession of weapons illegally,

5    is nothing but that.  They don't have probable cause for that.

6          My client's wife is not a prohibited possessor.  She

7    is not prohibited from owning weapons.  She lives with him.

8    Weapons that are owned by her are not his.  If the government

9    had proof of that, I assume they would have brought those

10   charges.

11         The government's case is exceedingly weak, Your Honor.

12   Let's look at the facts as they are presented in the pretrial

13   services report.

14         Your Honor, my client is 58 years old.  He has had no

15   law enforcement contact in over 20 years, Your Honor.  These

16   allegations are from -- the most recent is 10 months old.  Your

17   Honor, he's some kind of massive threat that the government has

18   allowed to just remain free despite these statements that he

19   made on the internet 10 months ago, a year ago.

20         Your Honor, their own argument is undercut by their

21   lack of action.  He's not a threat to anybody.  He lives alone

22   with his wife, Your Honor.  He's had no law enforcement

23   contact.  He's had no negative -- he hasn't threatened anybody.

24   He hasn't had any negative law enforcement contact in 20 years.

25   Actually, more.  22 years, Your Honor.

1          There are no warrants, Your Honor.  In his prior

2    criminal record, there are no failures to appear.  He showed up

3    for court.

4          Your Honor, he's lived in the same house for 13 years.

5    Hasn't moved.  He hasn't fled.  He hasn't gone anywhere.  He

6    has no substantial resources, Your Honor.  He has no ability to

7    flee.  He runs a ranch that requires constant attention.

8          As the letter I submitted to the Court shows, his wife

9    wanted to be here but she couldn't be here because she has to

10   tend to their animals.  They have chickens.  They have other

11   things.  It's remote.  There are coyotes and hawks and things

12   that they need to protect -- threats to their livestock, Your

13   Honor.

14         I think the letters also reflect that he has excellent

15   support from his wife.  He also has community support from a

16   neighbor.  His wife indicated to me that other people in the

17   community also indicated their support for him.  They know him

18   as a person who keeps to himself and is otherwise a polite and

19   helpful person in the community.

20         Your Honor, finally, he has Stage 4 colon cancer, Your

21   Honor.  He can't flee.  He has nowhere to go.  He has no

22   ability to flee, and his physical condition prevents him from

23   fleeing.

24         Your Honor, over the weekend -- he can't really eat

25   the food at the jail, so he's been essentially without food for

1    five days.  He was found unconscious in the jail in a pool of

2    blood.  They took him to the hospital.  They gave him

3    intravenous hydration and I suspect some nutrition.

4         He simply -- he's not a threat to anybody.  He was --

5    before his cancer, he was 190 pounds.  He's now about 140

6    pounds, Your Honor.  He needs care.  He has not been in -- he's

7    entitled to get the kind of care that he desires, Your Honor.

8    His understanding is he had brain cancer.  Through treatment

9    from his wife and a medicine woman, that has gone into

10   remission, but it metastasized to his colon.

11        He has had no law enforcement contact in 20 years,

12   Your Honor.  The government thinks he's a big threat.  They

13   failed to articulate a single threat, frankly, in their

14   statement.  Obviously an indictment has been issued, but that's

15   an un- -- the evidence is untested.  The government can

16   essentially present a very one-sided picture to a grand jury.

17        We would ask the Court to find that the government's

18   case is not strong, that he has no prior criminal record in the

19   past 20 years, and has been in the same residence for 13 years,

20   he's married long-term, he has good family and community

21   support, and release him on pretrial services' supervision.

22        Thank you, Your Honor.

23        THE COURT:  Thank you, Mr. Mulligan.

24        Ms. Osborne.

25        MS. OSBORNE:  Your Honor, with respect to the criminal

1    history, yes, it is dated.  But what is concerning are the

2    entries which do evince the defendant's propensity of violence

3    toward police officers.  There is a -- and other violence.

4         There's a robbery from '86, no disposition; battery

5    from '86, no disposition; battery on a peace officer from '89,

6    or emergency personnel, from '89, no disposition; battery on a

7    peace officer, for which the defendant was apparently confined

8    for two years in 1989; also assault by a prisoner in 1990, for

9    which the defendant was apparently sentenced to four years and

10   eight months.

11        So there is definitely a demonstration of a

12   willingness to engage in violence, however long ago it was.

13        What I would say about the defendant's comments with

14   respect to -- or counsel's comments with respect to the

15   defendant being no threat, one threat that I did forget to

16   mention to the Court is when law enforcement was interviewing

17   the defendant on December 1st, he did state:  If you hurt my

18   wife, I'll come after every last one of you.  And essentially

19   threatened to kill law enforcement and stated:  That is no idle

20   threat, and emphasized this was no idle threat.

21        The other thing I would point out, and perhaps it's

22   obvious, is that whether the defendant himself is too ill to

23   get up and out of his house to harm law enforcement, he

24   certainly set up the stage to harm law enforcement, as

25   evidenced by the condition of his residence.

1            And perhaps one of the equally dangerous things the

2    defendant has done is sent the postings and communications out

3    to the vast public, inciting violence against law enforcement.

4    And that is extremely dangerous, and that is shown by the

5    defendant's association with the Trains and two Queensland

6    police officers who died, as well as a civilian neighbor who

7    came to see what was happening.  That person died as well.

8            The defense says the defendant is too ill, perhaps, to

9    present a danger.  I see that there is no formal diagnosis.  It

10   appears that the defendant has refused to see a doctor, and so

11   to the extent the Court considers his illness, I would submit

12   that for the defendant's own personal health, he's better off

13   in custody where he can get care and treatment than out of

14   custody, but more concerning is the threat that he clearly

15   poses.

16           THE COURT:  Thank you, Ms. Osborne.

17           In making my decision, I am guided to make this

18   decision based on the assessment of several factors.  They

19   start off with the nature and circumstances of the offenses

20   that are charged.

21           In this case, the defendant has been indicted, and

22   it's really a speaking indictment that sets out in great detail

23   the events in Australia leading to the death of three

24   individuals.  And -- well, ultimately, the very, very

25   devastating series of events that occurred in Australia and

1   what the defendant's role or role with those -- with the two

2   individuals who started that was.

3          However, the specific -- I want to be very clear.

4   There is a constitutional right to express ideology and

5   beliefs.  The issue comes when there is action and specific

6   threats or there are threats, and that is really the line that

7   the particular -- the current indictment sets out here has to

8   do with actions specific -- well, and specific threats as

9   described in the indictment.

10         But I do want to be very clear.  This is -- there is

11  no prosecution for ideology or beliefs, and I recognize that

12  the United States has set out a lot of ideology, and if I'm

13  interpreting that correctly, it's related to try to explain

14  what the mental intent behind the threats have been and behind

15  the danger posed by the firearms in the situation there on the

16  property.

17         So I want to be very clear that I'm not considering

18  this in terms of ideology or beliefs, which are protected.

19  There is a difference, and that is something that we do in the

20  court, is to separate those issues out.

21         In any event, the underlying cases concerning the

22  United States's proffer that based on the search warrants

23  conducted last Friday that there are likely to be additional

24  charges coming, Mr. Mulligan's quite right.  He can't

25  cross-examine a proffer, and certainly the current charges

1    relate to the threats that are described in the indictment.

2          But I believe the United States has set out that given

3    the evidence that has been described from last Friday, and

4    based on the situation that Mr. Day finds himself in with a --

5    with felony convictions, that there may well be subsequent

6    events -- or offenses coming.

7          I take that in the light in which it was offered.

8    That is not what I'm examining now, but I certainly understand

9    that distinction.

10          The next factor that I'm guided to look at is one that

11    the Ninth Circuit has directed us to give the least

12    consideration, and that would be the weight of the evidence.

13          It does appear based on the nature of the speaking

14    indictment, based on the evidence that has been proffered, that

15    the weight of the evidence appears to be strong, but given the

16    Ninth Circuit direction, I'm not going to give that a lot of

17    consideration, which is the appropriate level.

18          The next part that I look at or that I'm guided to

19    look at, I really put together related category of history and

20    characteristics of the defendant, and that includes character,

21    physical and mental condition, family ties, employment, length

22    of residence in the community, community ties, past conduct,

23    any history of drug or alcohol abuse, and record of

24    appearances -- appearance in past court hearings.

25          It does appear the defendant's -- I'll sort of go from

1    the bottom up.  When considering that, it does appear the

2    defendant's criminal history is quite old.  It is concerning in

3    that the defendant does have felony convictions, but it does

4    appear that these are quite old.

5         I do see a pattern that is concerning based on the

6    criminal convictions involving law enforcement officers, given

7    the current charges, but I understand the time period that's

8    been involved between those things.  But I do note that that

9    factor is there, and it is something that I would give some

10   consideration to.

11        It does appear that the defendant has strong ties.

12   I've reviewed the character letters from his wife and from a

13   neighbor who obviously has had a positive experience and does

14   reflect well on the defendant's character.

15        Conversely, though, I am allowed to consider what the

16   United States has proffered in that regard, and it is

17   concerning in terms of character and the way that really the

18   structure of law enforcement has been characterized by the

19   defendant.  It is of concern to the Court.

20        And I -- again, I recognize there is a constitutional

21   right to ideology and beliefs.  But it is concerning when that

22   ideology involves really a violent ideology relating to the

23   structures that keep this society functioning.  So it is of

24   concern.

25        It's difficult to assess what to make of the physical

1   condition.  The defendant proffers that he is in poor health.

2   That appears to be -- well, and he's certainly reflecting that

3   in the courtroom, both this morning and this afternoon.  It's

4   unclear when a diagnosis was reached.  It is concerning to the

5   Court that he's not sought medical treatment.  And again, he's

6   entitled to seek the medical care of his choice, and he's done

7   that, and he believes that that's been helpful to him.  But it

8   is very difficult given the lack of other information about

9   that to assess that certainty.

10          And I will say as well that there is -- even if the

11  defendant is in poor physical condition, weapons are certainly

12  quite the equalizer when it comes to individuals who are in

13  weaker physical condition.  And it is concerning to hear about

14  the circumstances at the defendant's property, which do seem to

15  be consistent with the threats that he's made.

16          I am concerned by what appears to be really a sniper's

17  nest on the top of a Conex box on this property, which is in a

18  remote location, and by the presence of dugouts.  There may be

19  another explanation, but I do reflect on the pretrial services

20  report that reflects as well a shooting range on the property,

21  which given the defendant's status as a felon and his

22  statements about being a felon who's armed, it is of concern to

23  the Court really how that all plays out.

24          The last factor that I look to is the nature and the

25  seriousness of the danger posed to any person or to the

1    community.  And I do have real concerns based on what's been

2    proffered.

3            I have specific concerns about statements that are

4    attributed to the defendant as recently as last Friday, that if

5    he gets out of the cuffs, that he will come after the officers

6    who were involved, and that is of concern.  That is a pretty

7    specific threat to kill very specific individuals.

8            And it does appear that the defendant has prepared for

9    that eventuality.  I am concerned by the presence of body armor

10   and gas masks, which would seem to be anticipating action on

11   his property as well.

12           And his statements, although they were hypothetical

13   about what would have happened had law enforcement gone on to

14   his property, is of concern, and it's not this Court's intent

15   to ever set out a situation where that situation would come to

16   fruition, frankly.

17           I do also find that the nature of the indictment and

18   what has been described do cause this Court concern about

19   whether the defendant would follow the Court's orders.  I will

20   note the defendant has been entirely respectful and appropriate

21   in the courtroom, and I -- he has not given any cause in the

22   courtroom for any concerns about how seriously he takes the

23   Court's actions.

24           But I have -- I am -- I do have some concerns about

25   how I would be able to structure anything that would address

1    the concerns that have been raised or the facts that have been

2    raised.

3            The long story short is I do find -- and I need to

4    spell out what the legal burdens are.

5            The United States has established, I think, by a

6    preponderance of the evidence that the defendant poses a risk

7    of nonappearance at future proceedings.  There may be

8    conditions that perhaps could be attached that would reduce

9    that risk.  I'm struggling to think about what those could be.

10           But the Court's more considerable concern has to do

11   with the dangerousness.  Now, because of the nature of this

12   concern, the United States' burden is to establish by clear and

13   convincing evidence that the defendant poses a danger.

14           And I do find the United States has established beyond

15   clear and convincing evidence that the defendant poses a danger

16   as described by the statute.  And I have real concerns as well

17   about what has been described in terms of obstructing potential

18   testimony or witnesses; i.e., the law enforcement officers as

19   well.

20           So I do find specifically that there aren't any

21   conditions that I could attach to reduce those risks or to

22   mitigate those risks to a degree that the Court would be able

23   to release the defendant and basically remove that

24   dangerousness assessment.

25           So, sir, you will be maintained in custody pending

1    further proceedings in this matter.

2         Now, you heard me announce the trial date in this case

3    and that its location is in the Phoenix courthouse.  What that

4    means is that at some point in the fairly near future, you'll

5    be transported to a facility that's closer to Phoenix.  And I

6    will say it is a facility that has better medical care than the

7    facility you're in currently, so to the extent that that may or

8    may not be helpful.

9         But that transport will take place at some point in

10   the future.  In any event, you will likely receive a new

11   attorney with the Federal Public Defender's Office, the idea

12   being it will be an attorney in that office who works every day

13   out of the Phoenix courthouse and will be able to represent you

14   for hearings in that courthouse and may have an easier time

15   being able to consult with you in that next facility that

16   you'll be in.

17        So I believe that we've handled everything that we can

18   take care of here today.  I do want to check with the attorneys

19   before we adjourn just to make sure.

20        Ms. Osborne, is there anything further on behalf of

21   the United States?

22        MS. OSBORNE:  No, Your Honor.  Thank you.

23        THE COURT:  Mr. Mulligan, is there anything further on

24   behalf of your client?

25        MR. MULLIGAN:  No, Your Honor.  Thank you.

1          THE COURT:  Good luck to you, sir.

2          (Proceedings concluded at 3:24 p.m.)

UNITED STATES DISTRICT COURT

```
1                      C E R T I F I C A T E

2

3            I, JENNIFER A. PANCRATZ, court-approved transcriber,

4    certify that the foregoing is a correct transcript from the

5    official electronic sound recording of the proceedings in the

6    above-entitled matter.

7

8            DATED at Phoenix, Arizona, this 22nd day of December,

9    2023.

10

11

12

13                              s/Jennifer A. Pancratz
                                Jennifer A. Pancratz
14

15

16

17

18

19

20

21

22

23

24

25
```