JON M. SANDS
Federal Public Defender
District of Arizona
850 W. Adams, Suite 201
Phoenix, Arizona  85007
Telephone: 602-382-2700

MARK RUMOLD
California Bar #279060
JAMI JOHNSON
New York Bar #04823373
Asst. Federal Public Defenders
Attorneys for Defendant
mark_rumold@fd.org

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>                    Plaintiff,<br><br>          vs.<br><br>Donald Day, Jr.,<br><br>                    Defendant. | No. CR-23-08132-PCT-JTT<br><br>**Sentencing Memorandum**<br><br>**(Filed Partially Under Seal)** |

Donald Day, through counsel, respectfully urges the Court to sentence Mr. Day to 27 months in custody, followed by 1 year of supervised release. The requested sentence is sufficient, but not greater than necessary. *See* 18 U.S.C. § 3553.

Mr. Day is before the Court to be sentenced for violating 18 U.S.C. § 922(g)(1). Mr. Day pled guilty; he admitted to possessing firearms; he admitted that he had prior felony convictions and that he knew about those convictions; and he agreed to forfeit any interest he had in the firearms and ammunition that were seized. Mr. Day should be sentenced for that crime.

But this prosecution has taken nearly everything from Mr. Day's life. It led to his separation from his longtime partner; it removed him from his property, his

animals, and his livelihood; ██████████████████████████

██████████████

For the reasons described below, a sentence of 27 months is sufficient, but not greater than necessary, to achieve all legitimate sentencing objectives.

## I.    BACKGROUND

### A. Mr. Day's Early Life

Mr. Day's childhood was marked by abuse and isolation.

He did not have a good relationship with either parent. His father was physically abusive. In addition to physical violence, Mr. Day recalled one incident where his father intentionally shot a firearm at him to scare him. Mr. Day's relationship ended with his father when he was 13 or 14 years old. PSR ¶ 70.

His mother, who primarily raised Mr. Day, was physically and emotionally abusive, as well. She "repeatedly told [Mr. Day] he would never amount to anything," and his mother "beat him, threw objects at him, and forced him to sleep outside in the shed." PSR ¶ 71. Mr. Day's mother remarried multiple times, and Mr. Day's step-fathers were also physically abusive. *Id*. Mr. Day's sister described the abuse as "severe." *Id*. at ¶ 73.

The overwhelming sentiment Mr. Day has from his childhood was that "he was not wanted [by] both of his parents." *Id*. Mr. Day was led to believe "he was a burden to his family and carried a curse." *Id*. at ¶ 72. He "did not want to burden anyone else with his troubles . . . and decided to keep to himself." *Id*.

Around the age of 13, and unable to tolerate the abuse at home, Mr. Day began to act out. He spent much of his teenage years, in the early 1980s, in juvenile detention in Los Angeles County. Conditions in those facilities were "among the worst" in the country, according to a federal review conducted in 1986. *See* Lois Timnick, *U.S. Investigator Says L.A. Juvenile Hall is Among 'Worst' He's Seen*,

L.A. Times (Apr. 6, 1986).[1] Federal investigators reported that juveniles were "hogtied, packed closely, ill-protected against violent youngsters, and subjected to verbal, psychological and physical abuse by the staff." *Id*. Some children were "held in an isolation unit known variously as 'the box' or the 'the hole.' *Id*.

After suffering emotional and physical abuse at the hands of his parents; and after placement in equally abusive juvenile custodial conditions; Mr. Day predictably continued to act out. In the mid-to-late 1980s, while Mr. Day was in his early 20s, he was convicted of several state offenses in California and Wyoming, *see* PSR ¶¶ 53 – 56.

Ultimately, Mr. Day was incarcerated in the newly-opened Pelican Bay State Prison. Conditions at Pelican Bay, like the juvenile facility before it, were abysmal. A federal judge found that the conditions there, during the time Mr. Day was in custody, violated the Eighth Amendment because the facility failed to provide "constitutionally adequate medical and mental health care," and "permitted and condoned a pattern of using excessive force, all in conscious disregard of the serious harm that these practices inflict." *Madrid v. Gomez*, 889 F. Supp. 1146, 1161, 1279 (N.D. Cal. 1995). With regard to the use of force, the Court found that correctional officers used force where there was "no justification for the use of force" or "the amount of force applied was so strikingly disproportionate to the circumstances" that it was most likely used "for the very purpose of causing harm," rather than restoring order. *Id*. at 1161. In the Special Housing Unit (SHU), where Mr. Day was incarcerated, the Court noted that the "SHU severely deprives inmates of normal human contact and substantially reduces their level of environmental stimulation." *Id.* at 1232. Those conditions, according to the Court, "hover[ed] on

---

[1] *Available at* https://www.latimes.com/archives/la-xpm-1986-04-06-me-25091-story.html

the edge of what is humanly tolerable for those with normal resilience," *id*. at 1280; for others, it "either massively exacerbated a previous psychiatric illness or precipitated psychiatric symptoms." *Id*. at 1232.

Mr. Day was abused by his parents as a child; he was subjected to conditions—in both LA county juvenile facilities and at Pelican Bay—that were cruel and unusual. When Mr. Day was released from prison in July 1994, he left custody a profoundly damaged man.

**B. Mr. Day's Life in Arizona**

Nevertheless, following his release from prison, Mr. Day tried his best to put his past behind him. For the next 30 years—until his arrest for this case—he was largely successful.

He did ironwork in California and other locations; then he relocated to Flagstaff. *See* PSR ¶¶ 75-76. He stopped using drugs (with the exception of marijuana) and he was not abusing alcohol. Eventually, he met Sabrina Spires. They began a long-term, committed relationship. In 2013, Ms. Spires purchased a large, rural property in Heber, Arizona, and Mr. Day and Ms. Spires lived there together for nearly a decade.

Mr. Day and Ms. Spires were homesteaders. They lived off-grid and they tried to practice subsistence farming. They raised chickens and pigs and grew some crops. They traded and bartered for things they needed. To earn money, Mr. Day would work as a mechanic for neighbors; he would sometimes fix discarded items and then resell them. Ms. Spires sold pigs and chickens; at one point, she worked at a Subway in town. Together, they lived an isolated, relatively quiet existence in rural Navajo County.

Like many people in rural areas, that existence included firearms. Mr. Day and Ms. Spires had 9 firearms on the property, along with ammunition. Ms.

Spires purchased the majority of the firearms.[2] As Ms. Spires explained to the FBI, firearms are just "another farm tool," as "essential as having a shovel or a pickaxe." *Transcript of Interview with Sabrina Spires* at 177, lns 19-20, 22 (Dkt. 282-2).

Part of the reason Mr. Day and Ms. Spires lived off-grid—and part of the reason they possessed firearms for self-defense—was a shared, grim view of society. Mr. Day's social and political views are, admittedly, not mainstream. He is distrustful of authority and government—perhaps owing to the mistreatment he suffered at the hands of authority figures throughout his life.

Mr. Day was not shy about sharing his views. Mr. Day would make online comments, on Facebook, YouTube or Twitter, about social and political topics. For example, he left long posts on the Navajo County Sherriff's Facebook page, complaining about wind farms and his view that the County was giving preferential treatment to corporate interests. *See* Ex. 2 (selected Facebook posts of Mr. Day) at 1, 2. He would post long, quasi-spiritual musings about life and society. *See id.* at 3, 4. And Mr. Day had minor disputes with neighbors—about trespassing, about dogs coming onto their property, or other perceived grievances. *See, e.g.*, Ex. 3 (Navajo County Sherriff's report).

Overall, Mr. Day's views were deeply held and, often, strongly—even offensively and vehemently—stated. Mr. Day's rhetoric was typically vague; often impolite; and it often invoked violence or the view that a society was in danger or that a civil war was impending.

//

//

---

[2] At least one firearm, a rifle that was found in Mr. Day's workshop, was given to him. *See* Ex. 1 (FD-1023 Reporting Document, *CHS Reporting*).

### C. <u>The Investigation of this Case</u>.

Mr. Day was an outspoken village gadfly—tucked into a rural corner of Arizona. But it was Mr. Day's outspokenness, and his online connection with people half-a-world away, that gave rise to this case.

Mr. Day had a YouTube channel where he posted videos explaining his social and political views. He would comment on other users' videos, too.

Eventually, Mr. Day began exchanging videos and comments, publicly, with Gareth and Stacy Train. Although separated by nearly 10,000 miles, the Trains and Mr. Day shared a similar, distrustful view of society. Mr. Day never met the Trains in person (or even communicated with them outside of their public YouTube exchanges). Indeed, Mr. Day's knowledge of the Trains was sufficiently limited that, in his interview with FBI, he did not know if he was communicating with Gareth or Nathaniel. *See* Ex. 4, Excerpts of Transcript of Interview of Mr. Day at 216-217.

The only information Mr. Day knew about the Trains was information the Trains provided him. Mr. Day knew the Trains lived in rural Australia, and that they had been teachers at one point. Mr. Day was told that the Trains were trying to expose a scandal relating to sexual abuse and sex trafficking of Aboriginal children in Australia. *See* PSR ¶ 19. The Trains told Mr. Day that they had gone to the police about the abuse, but the police had not done anything. *Id.* Indeed, according to the Trains, rather than investigate the sexual abuse, the Australian police and the Australian Security Intelligence Organization (ASIO) were investigating and harassing the Trains. *Id*. The Trains explained to Mr. Day that the Australian authorities were targeting them, based on their whistleblowing and their beliefs about the COVID-19 pandemic. *Id.*

From Mr. Day's perspective—from Navajo County, 8,000 miles away, and based only on the information the Trains had provided him—the Trains' treatment at the hands of Australian law enforcement was scandalous. And, because it was consistent with his own grim view of society, Mr. Day never questioned whether it was true.

What Mr. Day *did not know*, however, was that the Trains "were suffering from a Shared Delusional Disorder . . . They were psychotically unwell, and driven by their persecutory beliefs." *Coroners Court of Queensland*,[3] *Findings of Inquest*, Brisbane, Australia (November 21, 2025) (hereafter "*Coronial Inquest*") at 233 (¶¶ 1050, 1051).[4]

Mr. Day and the Trains exchanged messages and videos on YouTube for a little more than a year, from approximately May 2021 to December 2022.

*     *     *

On December 12, 2022, four constables from the Queensland Police Service climbed over the front gate of the Trains' rural property in Wieambilla, Australia. *Coronial Inquest* at 6 (¶ 1). The officers were attempting to locate Nathaniel Train, who had been reported missing by his wife. *Id*. (¶ 2). To the Trains—laboring under the delusion that Australian authorities were coming to kill them—this was not just

---

[3] In Australia, by law, a "coronial inquest" is required when a death occurs while an individual is in police custody, or a death occurs in relation to police operations. *See Coronial Inquest*, at 9 (¶ 26). "An inquest is a fact-finding exercise and not a process for allocating blame. . . . In an inquest there are no parties, there is no indictment, there is no prosecution, there is no defence, there is no trial simply an attempt to establish the facts. It is an inquisitorial process, a process of investigation quite unlike a trial." *Id*. at 13 (¶ 33).

[4] *Available at* https://www.coronerscourt.qld.gov.au/__data/assets/pdf_file/0012/888627/Findings-of-inquest-into-the-deaths-at-Wieambilla-Redacted-25.11.2025.pdf

7

a routine visit from the police: it was a threat to their life. As the Coronial Inquest explains:

> Gareth, Stacey and Nathaniel truly (but wrongly) believed that they were being attacked and were required to defend themselves against that attack. They believed war had reached their gates and they had to defend themselves against the evil attackers in accordance with God's will and, in that way, reach their own salvation. They wrongly believed they needed to die, rather than be apprehended.

*Coronial Inquest*, at 235 (¶ 1059).

The Trains killed two police officers and a neighbor that day.

Several hours after the shooting, the Trains posted a video to YouTube, in which they directly addressed Mr. Day. *Coronial Inquest* at 226 (¶ 1017). In it, they explained: "They came to kill us. We killed them." *Id*.

Hours after posting the video, the Trains were killed by Australian police.

Mr. Day, shocked by the news that his friends had been killed— and harboring the belief that Australian authorities had targeted the Trains and intentionally killed them—posted an emotional video in response. In it, he said: "It is no different for us. The devils come for us, they fucking die. It's just that simple. We are owned by no one." *See* PSR ¶ 9.

In the days following the shooting, first Australian, then American authorities turned their attention to Mr. Day. Mr. Day's communications with the Trains led to a year-long investigation of him. No aspect of Mr. Day's life went unexamined:

- The government obtained 5 search warrants and court orders for Mr. Day and Ms. Spires' online communications;

- The government conducted surveillance of his home, including aerial surveillance and surveillance from the ground;

8

- The government sent a confidential informant into Mr. Day's home on at least 3 occasions;

What the government did not do, however, was talk to Mr. Day.

But, after a year of investigation, Mr. Day was charged with two federal crimes: the alleged threat he made in his video response to the Trains, which was publicly posted on YouTube a year prior, and a second alleged threat made in an unrelated online comment. After a year of investigation, there was no evidence to suggest Mr. Day bore criminal responsibility for the events in Australia, nor was there evidence to suggest he had any advance knowledge of the Trains' plans.

A subsequent court authorized search of Mr. Day's property, based on the initial threat charges, resulted in the seizure of the firearms at issue in Counts 3 and 4. A final charge was added, Count 5, after Mr. Day allegedly threatened FBI agents after he had been arrested.

*      *      *

Mr. Day pleaded guilty to Count 3 in October 2025. (Dkt. 276).

The parties agree that Mr. Day's sentence will not exceed the low-end of the Sentencing Guidelines. The government has agreed to dismiss Counts 1, 4, and 5 at sentencing. Count 2 was previously dismissed by the Government, on its own motion.

## II.    Sentencing Recommendation

Mr. Day respectfully requests the Court impose a sentence of 27 months in custody, followed by one year of supervised release.

The "overarching statutory charge for a district court is to 'impose a sentence sufficient, but not greater than necessary' to reflect the seriousness of the offense, promote respect for the law, and provide just punishment," among other factors. *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (en banc) (citing 18 U.S.C. § 3553(a)).

The Sentencing Guidelines are but one of the many factors to be considered under § 3553(a). While the Guidelines may serve as the "starting point and the initial benchmark for sentencing decisions, *Gall v. United States*, 552 U.S. 38, 49 (2007), the district court may not presume the Guideline range is reasonable. The Court is free to impose a sentence below the one recommended by the advisory Guidelines. *United States v. Booker*, 543 U.S. 220 (2005).

Considering the Guidelines and the other § 3553(a) factors, the district court must make an "individualized determination based on the facts." *Carty*, 520 F.3d at 991.

Here, and as explained below, that individualized determination supports the requested sentence.

**A. Mr. Day should be sentenced for violating 18 U.S.C. § 922(g)(1), not for any other alleged conduct.**

Mr. Day is before the Court for sentencing after pleading guilty to violating 18 U.S.C. § 922(g)(1). He should be sentenced for that crime, and only that crime.

Mr. Day admits to possessing firearms on the property that he shared with Ms. Spires; he admits that he knew he had prior felony convictions; and he acknowledges that his possession of firearms violates the law, as it currently stands.[5] He understands that he can be punished for the offense.

The Court should sentence Mr. Day based on the facts relevant to that count—not based on the events in Wieambilla nor the other allegations in the case.

The salient facts, for purposes of sentencing, are:

*First,* while Mr. Day did have prior felony convictions, those convictions are over 30 years old. After his release from prison in 1994, Mr. Day has lived a life that, while perhaps unconventional, was largely law-abiding. Mr. Day is now 61

---

[5] Mr. Day has preserved his right to pursue an appeal based on his belief that the Second Amendment permits him to possess firearms, notwithstanding his prior convictions.

years old and, aside from this conviction, has not been convicted of a serious crime in 35 years.

*Second*, the firearms Mr. Day possessed were all lawfully acquired. Many were purchased by Ms. Spires; one was given to Mr. Day. For an individual living in a rural location, nine firearms is not a particularly noteworthy quantity. Mr. Day did have a large quantity of ammunition; but that, too, is not uncommon.

*Third*, despite possession of firearms for over a decade, Mr. Day was never charged with, much less convicted of, any crime associated with the firearms.

*Fourth*, as early as 2016, the Navajo County's Sheriff Department was aware that Mr. Day was a prohibited possessor and was aware that there were firearms on the property. *See* Ex. 3 (Navajo County Sherriff's report) at 2. Despite this knowledge, Navajo County Sheriff officials were comfortable approaching Mr. Day on his property; Mr. Day was never charged with a crime related to his possession of firearms and ammunition; nor did the Navajo County's Sherrif Department see fit to intervene or even warn Mr. Day about firearm possession.

These facts counsel in favor of a mitigated sentence—one below the range suggested by the Sentencing Guidelines.

Indeed, the Guidelines likely overstate Mr. Day's overall responsibility for the offense. Mr. Day has a Base Offense Level of 20, because he was a prohibited person and because one of the firearms—a shotgun with a barrel of 16 inches—was found on the property. *See* PSR ¶ 36. However, there is no evidence that Mr. Day knew the length of the shotgun barrel (much less that he understood it was a crime to possess a shotgun with a barrel less than 18 inches). Further, recent legislative changes eliminated the tax on short-barreled shotguns, calling into doubt the Constitutional underpinnings of federal regulation of that type of firearm, more generally. *See* Motion to Dismiss Count 4 (Dkt. 23). If the short-barreled shotgun were treated as just another firearm, Mr. Day's offense level would be reduced by

*six levels*. Thus, under the facts here, the Sentencing Guidelines operate in a way that likely over-punishes Mr. Day for the actual offense conduct.

Overall, the facts of this offense justify a sentence of 27 months in custody— a sentence 10 months below the Sentencing Guideline range.

**B. Mr. Day was not responsible for the Wieambilla Shootings, and he is not guilty of each of the other offenses with which he was charged.**

Mr. Day is not responsible for what happened in Wieambilla, and he is not guilty of each of the other crimes with which he was charged. The Court should decline to consider any of it when sentencing Mr. Day.

1. Mr. Day is not responsible for the Wieambilla Shooting.

The Coronial Inquest determined that "rather than being motivated by religious beliefs shared by others in the community (however overvalued they were by the Trains)"—a likely reference to Mr. Day and the Trains' communications with him—"the actions of each of Gareth, Stacey and Nathaniel were explicable by their shared and idiosyncratic psychotic disorders." *Coronial Inquest*, at 234 (¶ 1054). Thus, according to the Coronial Inquest, it was the Trains' shared psychotic disorders, not their communications with Mr. Day, that explained their actions on December 12. Indeed, in this case, the government has recognized as much, as well. *See* Transcript of Proceedings on March 25, 2025, pp 14 (ln 10-12) ("Of course the government is not arguing here that the defendant is responsible for the horrific murders that happened in Wieambilla.").

Nor did Mr. Day approve of what the Trains did. As Mr. Day explained in his post-arrest interview with the FBI, Mr. Day "wished he could tell the Trains not to use violence and to try talking to police instead." PSR ¶ 19. In Mr. Day's words: "I would have tried to convince them and tell them killing these cops is not the way to go." *See* Ex. 4, Excerpts of Transcript of Interview of Mr. Day at 221 lns, 14-17.

12

What happened in Wieambilla is a tragedy. But it is a tragedy that Mr. Day is not responsible for. Mr. Day's sentence should not be affected by it.

2. Mr. Day's sentence should not be driven by the other charges in this case:

Mr. Day is not guilty of each of the other charges in this case. The Court should decline to consider those counts and the conduct associated with them when sentencing Mr. Day.

Each of the counts against him suffered from serious shortcomings:

**Count 1**: Mr. Day was charged with threatening to kill "devils" that might come to kill him. The government has alleged that Mr. Day meant something different: what he meant, the government alleges, is that any law enforcement officer that came to his property would be killed.

The premise of the allegation—that Mr. Day was virulently anti-law enforcement and would kill any law enforcement officer that stepped on his property—has always been incorrect: Mr. Day called law enforcement officials to his property multiple times over the years, to help with disputes with neighbors. *See, e.g.*, Ex. 3 (Navajo County Sheriff's report). In fact, the week before Mr. Day was arrested (and over a year after his alleged threat against the devil), a member of the Navajo County Sheriff's Department was at Mr. Day's property—checking on him because the deputy had heard Mr. Day had been sick (and because they had a friendly relationship). Of course, the deputy was not shot when he arrived at the property.

As Mr. Day explained after he was arrested, although his prior interactions with law enforcement had not uniformly been positive, he "knew better than that." He "knew that there's humans behind those badges" and that he wanted to "have a dialog . . . so that there's some kind of understanding." *See* Ex. 4, Excerpts of

13

Transcript of Interview of Mr. Day at 299 lns, 2-4, 6-7.

Indeed, Mr. Day was always open to dialog. As he explained to the FBI agents—and contrary to their assumptions about him—if they had wanted to know what Mr. Day knew about the Trains, all they needed to do was ask:

> **SA PHILLIPS**:· I want to know if we had gone up to your property today - - I know you kind of alluded to this a little bit earlier; right?· If -- if we had gone up to your property today to talk about all of this --
>
> **MR. DAY**:· Wow.· It would have been great. I would have invited you in for coffee. . . You can ask me whatever.

*See* Ex. 4, Excerpts of Transcript of Interview of Mr. Day at 293-295.

But even setting aside the flawed factual premise of the government's allegation, Mr. Day's statement itself was squarely protected First Amendment speech. "As a general matter, the First Amendment means the government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *United States v. Stevens*, 559 U.S. 460, 468 (2010). The speech at issue in Count 1—the asserted violence against "devils" that might one day come for Mr. Day—is the type of "vituperative, abusive, and inexact" political speech that the First Amendment fully protects. *Watts v. United States*, 394 U.S. 705, 708 (1969) (noting "profound national commitment that debate on public issues" may include "vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials").

What Mr. Day said might have been unpleasant; it might have been imprecise; but it was not illegal. To be clear: it is not a crime to *use* force in response to an unlawful deadly threat (be that unlawful threat posed by a person, a devil, or law enforcement). It is much less a crime to *threaten* its use. Nor is it a crime to threaten to use force against trespassers. For example, a sign saying "Trespassers

14

will be shot" is constitutionally protected speech. Mr. Day was threatening "devils" who would *unlawfully come to his home to kill him*. There is nothing unlawful about that.

Even if the use of force Mr. Day described would somehow be unlawful, the First Amendment would still protect the speech: "teaching of the moral propriety or even moral necessity for a resort to force and violence" retains First Amendment protection, so long as the speech itself does not inspire the imminent use of that unlawful force. *Noto v. United States*, 367 U.S. 290, 297–98 (1961).

Overall, Mr. Day's speech may have been unpleasant and it may have been "abusive" and "inexact," *Watts*, 394 U.S. at 708, but it was not criminal.

**Count 2**: The speech at issue in Count 2—an alleged threat against the Director of the World Health Organization—was, at best, understood as incitement to illegal action. But, again, speech advocating lawlessness or the use of unlawful violence becomes unprotected only when it is "directed to inciting or producing *imminent* lawless action and *is likely to incite or produce such action*." *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969) (emphasis added). Mr. Day's isolated comment on an obscure internet forum wholly failed *Brandenburg*'s test. The government, correctly, dismissed the count earlier in the case.

**Count 4**: To obtain a conviction at trial, the government would need to prove that Mr. Day knew the barrel of the shotgun was under 18 inches long. As described, *supra*, there is no evidence that Mr. Day knew the length of the shotgun barrel (much less that he understood it was a crime to possess a shotgun with a barrel less than 18 inches). It is not a crime to shorten a shotgun's barrel; it is only a crime to shorten a barrel below 18 inches. There is no evidence Mr. Day knew any of this.

**Count 5**: Mr. Day is charged with threatening federal agents after he was

arrested. Mr. Day is alleged to have told agents that, if agents hurt his wife when they were executing the search warrant at his property, he would hurt the agents in return. What the allegation omits, though, is that FBI agents threatened to come down on their property (and, by extension, Mr. Day's wife) like a "500 pound Gorilla." Nevertheless, and immediately following Mr. Day's alleged "threat," FBI agents removed Mr. Day's handcuffs; they allowed him to smoke cigarettes; they gave him coffee; and they talked to him for hours.

Regardless of whether the agents threatened Mr. Day first, or whether the agents actually felt threatened, the statement itself was not a crime. 18 U.S.C. § 115 is only violated when a threat is made against a federal official "with the intent to impede, intimidate, or interfere with" the performance of official duties. As Mr. Day made clear, the statement was made not to interfere with any official FBI business, but solely with the intent to protect his wife. Ex. 4, Excerpts of Transcript of Interview of Mr. Day at 56-57 ("My wife is my whole world . . . you leave her be-- she's safe, secure, that's all I care about.").

Accordingly, Mr. Day lacked the requisite intent to violate § 115. The FBI agents are not victims in this case, and the Court should not consider this allegation—or any of the dismissed allegations—when sentencing Mr. Day.





\*     \*     \*

The case has taken everything from Mr. Day: his life in Heber, his liberty, and, now, his health. Additional punishment, beyond what has already been imposed, is unnecessary.

17

Respectfully submitted:     February 5, 2026.

JON M. SANDS
Federal Public Defender

*s/Mark Rumold*
MARK T. RUMOLD
Asst. Federal Public Defender